Mr. Justice Jambs,
dissenting:
I dissent from the opinion of the majority of the court with reluctance, and only because I believe that this court simply has no power to deal with a priority given by statute to the United States as we might deal with the priority of a private party, and to subrogate a surety as against a co-surety to that priority, in the absence of any statute authorizing us to take possession of and apply that government remedy for the collection of a debt to the public. So far from justifying the exercise of such a jurisdiction, the judgment and the reasoning of the Supreme Court in Lidderdale’s Ex’rs vs. Robinson’s Ex’rs, 12 Wheat., 594, seems to me to forbid it.
The principle on which the power of a court of equity to subrogate sureties to the securities and remedies of the creditor stands, is that the creditor, when paid by the surety, is. under an equitable obligation to turn over to the surety such securities and remedies, and that this obligation can be enforced. In Lidderdale’s Ex’rs vs. Robinson, the plaintiffs’ testator had, as a joint endorser with the defendant of a bill of exchange, paid more than his share of the debt. Mr. Justice Johnson, in stating the case, said: “There is no question on his right to come in for that sum as a simple contract creditor; but he claims precedence, and the rank of a judgment creditor, under a particular provision of the laws of Virginia, and under an equitable principle, according to which he who pays a debt of a superior dignity is supposed to rank, in the application of assets, according to the dignity of the debt satisfied; or, in other words, is substituted for the creditor who held the prior debt.” The law of Virginia referred to placed protested bills of exchange, after the death of the drawer or indorser, on a level with judgments and these had priority. The court stated the principle as follows: '“That a surety who discharges the debt of the principal shall, in general, succeed to the rights of the creditor, as well direct as incidental, is strongly exemplified in those cases in which the surety is permitted to succeed to those rights, even against bail, who are them. *207 selves, in many respects, regarded as sureties. 2 Vern., 608; 11 Ves., 22. That such would be the effect of an actual assignment made by the creditor to the surety, or to some third person for his benefit, no one can doubt. But in the cases last cited we find the court of equity lending its aid to compel the creditor to assign the cause of action, and thus to make an actual substitution of the sureties, so as to perfect their claim at law. This fully affirms the right to succeed to the legal standing of their principal; and, after establishing that principle, it is going but one step further to consider that as done which the surety has a right to have done in his favor, and thus to sustain the substitution without an actual assignment * * * If the parties in this cause be considered as claiming under assignment from the holder of the bill, and each as assignee of the claim against his coindorsee, according to the actual state of their respective interests, there can be no doubt of the priority here claimed.” The remainder of the opinion is merely a demonstration that the court may enforce the obligation without an actual assignment, and as if it had been made. The chief justice, in deciding the same .case in the circuit court, had said: “Where there is a principal and surety, and the surety pays off the debt, he is entitled to have an assignment of the security.” The right of the surety was rested on the same principle in England. In Ex parte Crisp, 1 Atk., 133, Lord Hardwicke said, that where the surety paid off the debt he was entitled to have from the creditor “an assignment of the security, to enable him to obtain satisfaction for what he had paid beyond his proportion; ” and in Morgan vs. Seymour, 1 Ch. Rep., 64, the court decreed that the creditor should assign his bond to the two sureties, to the same end. It is true that, since the decision of Copis vs. Middleton, it is held by the English chancery courts, though not in this country, that, in the case of a bond or other instrument for the debt, payment by the surety extinguishes the instrument, so that it cannot be so assigned; but that case only confirms the doctrine that the substitution of the surety stands upon the principle which I have indicated, *208 and that he cannot be substituted where the court has no power to compel an assignment. See, further, Hodgson vs. Shaw, 3 Mylne & Keene, 191; Clasan vs. Morris, 10 Johns., 524; Cuyler vs. Ensworth, 6 Paige, 32; Eno vs. Crooke, 10 N. Y., 66 ; Burge on Sur., 355 ; Sheldon on Subrog., sec. 87.
Now the modern practice, by which the surety is allowed to avail himself of the creditor’s securities and remedies, without an assignment and without making the creditor a party, has not, of course, affected the principle upon which the powers of the courts of equity rest, nor enlarged the jurisdiction of those courts. That jurisdiction still depends upon the power which equity has to compel the performance of the creditor’s obligation to turn over to the surety, who has paid the debt, any securities and remedies which he himself had acquired for the collection of that debt from the principal or another surety. If this is the basis, and therefore the measure, of the power of equity, in the matter of substitution, it follows that no court of equity in this country, either of the United States or any one of the States, has jurisdiction or power to substitute a surety to the priority of the United States, except just so far as the United States have by statute consented that they may do so. It may be that, where the United States have taken from the principal or one of the sureties a mortgage or other similar contract •security, the government may be treated as a party to an ordinary contract, and such consent may be implied; but I do not perceive how any such consent can be implied in the case of a security in the form of a remedy provided by a public statute; especially in the face of a statute which contains an express and limited consent to a subrogation to such remedy. The judicicial power conferred by the Constitution is power in imitum, and is not power over the United States, any more than the judicial power of the English courts, theoretically derived from the king, is power over the king. When such power is apparently exercised by those courts, it is always by the king’s consent, and not as power. I do not mean, by this comparison, to imply that the superiority of the United States to the control ininvitum *209 of their own judicial power, rests upon any such analogy. It arises from construction of the Constitution which establishes and defines that power. In accordance with this principle, Congress has always been careful to provide by statute the extent to which private parties may avail themselves of its securities, and in accordance with this principle they cannot do so in any case to which the United States are not shown to have consented.
The practice of the Exchequer Court in allowing the sureties of crown debtors to use the crown process against their principals and co-sureties, has been referred to as if it were an example of the power of equity to do the same thing. The true character of the proceedings in such cases is shown in Regina vs. Salter, 1 Hurlst. & Norm., 274, and by the cases cited in the note to The King vs. Bennett, 1 Wightwick, 1. In Regina vs. Salter, the application on behalf of the sureties was for an order that they should be placed in the situation of the crown, and that the writ of extent, which had issued against the defendant (the principal on the bond), should be put in force in their behalf, until they should be reimbursed what they had paid. The order was nisi, and was afterwards made absolute, “counsel appearing on the part of the crown, and consenting.” And this was the course taken in all cases. See Eegina vs. Eobinson, in a note to the case last cited. These cases involved the exercise of the peculiar power's of the Exchequer Court, and that court does not appear even to have been governed by the equity doctrine which has been appealed to; for, in a note to The King vs. Bennett, Wightw., p. 6, the reporter states that he had found on the order book of 1702 a ca.^e in which a stranger, who had offered to pay the crown’s debt for the credit of the debtor, was allowed to have the crown’s prerogative process. Clearly there is nothing in the practice of the Exchequer which tends to show that a court of equity has power to take possession of the remedies of the United States on behalf of a surety as against a co-surety.
Now Congress, so far from consenting that the priority *210 established for the United States should be controlled by the courts of equity so far as to apply it as between co-sureties, seems designedly to have excluded that particular case, while providing for such control and application as between the surety and his principal. Four statutes on the subject of priority wsre enacted in nine years, and the system was perfected only step by step, and from all of these law's the case of co-sureties was excluded. The act of August 4,1790 (1 Stat., 169) provided only for the priority of the United States, and against the estates of debtors on customs bonds; making no provisions for sureties. Two years later, by the act of May 2, 1792, sec. 18 (1 Stat., 263), it was provided that sureties on such bonds should have, against the estates of their principals, the same priority which had been given by the earlier act to the United States. Five years after-wards, by the act of March 3, 1797 (1 Stat., 515), the priority of the United States was extended to the estates of all debtors, but nothing was said in that act about sureties, and their priority remained as limited by the act of 1792. Finally, the priority of the United States was further'regulated, and priority was extended to sureties on other than customs bonds, by the act of March 2, 1799, sec. 65 (1 Stat., 676). In this extension of the right to a new class of sureties, the affirmative statement of the right was limited to priority against the estates of the principals on the bonds.
This condition of the statute law has been undisturbed for eighty-six years. Was it uot intended to be the whole of the law on that subject? The authors of this legislation were not unacquainted with the doctrine of subrogation to the lights of creditors, as applied by courts of equity between co-sureties on bonds between private persons; and in providing for sureties, could not fail to consider that matter at some one of the various steps in perfecting their legislation on the subject of priority. I conceive that the legitimate conclusion to be drawn from the number of these steps, and from the final form of ite action is, that Congress intended by this legislation to dispose of the whole subject of priority, so far as parties to public bonds were concerned, and
*211 to determine by it precisely how far subrogation should he applied by the courts to the government’s right of priority. From their own application of that doctrine, thus intended to be discriminating and final, subrogation to this government remedy, as between co-sureties, seems to have been designedly excluded. Even if it were true that the ordinary jurisdiction of equity would, without an authorizing statute, have included such control over such a remedy, this designed omission in a statute, manifestly dealing with the whole subject of priority, would amount to an exclusion of the power of equity to apply its ordinary rule to the omitted case. I do not mean, of course, that the courts of equity were thus deprived of power to enforce contribution among co-sureties, because a suit for that purpose is not mentioned in the statute. I confine the argument to the particular question of the control of equity over the peculiar remedy of priority given to the government. The principle of intended exclusion, to which I refer, has been applied so as to work even the repeal of a statute. In Murdock vs. The City of Memphis, 20 Wallace, 617, the Supreme Court considered the question whether the act of February 5, 1867, 14 Stat., 385, had the effect, to repeal the 25th section of the Judiciary Act, when Mr. Justice Miller said: “A careful comparison of these two sections can leave no douht that it was the intention of Congress, by the latter statute, to revise the entire matter to which they both had reference, to make such changes in the law as it stood as they thought best, and to substitute their will in that regard entirely for the old law upon the subject. We are of opinion that it was their intention tc make a new law so far as the present law differed from the former, and that the new law, embracing all that was intended to he preserved of the old, omitting what was not so intended, became complete in itself and repealed all other law on the subject embraced within it.” United States v. Tynen, 11 Wall., 88; Henderson Tobacco, Ib., 652; Bartlett vs. King, 12 Mass., 537; Cincinnati vs. Cody, 10 Pick., 36. A fortiori must a similar exclusion of a mere rule of equity, from what was intended tp be a complete provision of *212 subrogation to priority, have tbe effect to do away, if it had ever existed, the power here asserted. We must, in such a case, suppose that the statute took that limited form because it was expected and intended to accomplish the whole policy of the government. And how it should be a question of mere policy is perfectly intelligible. In the first place, priority was given to the government itself because it was necessary that the government should be secure of its revenues. In the next place, and to the same end, it was important to obtain sureties on the bonds of its debtors, and, in furtherance of this policy, it was deemed advisable, and at the same time sufficient, to offer to those sureties the same remedies against their principals which the government itself had. It is on the very face of this line of statutes that the legislature assumed that these priorities were a matter purely of administrative policy, and that such only should be allowed as it was necessary to allow in the interest of the government. In estimating the effect of this legislation it should be further observed that the strictness with which the priority of the government itself has been treated by the Supreme Court, suggests that the whole matter stands upon the affirmative provisione of the statute, and that, beyond these, no priorities exist.
I am of opinion, then, that this court has not tbe power, as a matter of ordinary equitable jurisriction, to control and apply to the- use of a pri vate party a priority given to the United States, except to the extent to which the legislature has expressly given consent, and that power- to do so as between co-sureties is not within the consent actually given. And I conceive that, if such power might have belonged to the . courts of equity without an affirmative grant or express consent, the intention of the legislature to exclude and forbid its exercise is apparent in the statutes to which I have referred.
I am aware that I give the more weight to the objections which have been stated, because I hold that priorities against the other creditors of an estate do not stand upon any *213 equitable ground, and are justifiable only on grounds of overruling policy or necessity. Equal distribution of an insolvent estate is tbe rule which commends itself to equity, a rule which is not to be forgotten by a court of equity when it is called upon to determine what, upon consideration of all the lights to be affected, it is equitable to do in such a matter as that before us. I do not conceive that we are called upon to apply the rule of substitution, on grounds of pure equity, to a special remedy given to the Government, with the effect of thereby ignoring the other creditors of the insolvent estate. And to my mind the suggestion that these other creditors have nothing to complain of, because they would have suffered justas much if the Government had enforced this priority for its own behoof, is of no force. I do not perceive how it follows from the fact that the United States had been given a legal right to such a priority, because it was indispensable that tbe Government should have its revenues, that therefore it was equitable that the general creditors should suffer to the same extent at the hands of a private party, in whose behalf no such necessity is recognized.